IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RONNI JACOB                         :

                                    :

    v.                              : Civil Action No. DKC 2006-0342

                                    :

DIDLAKE CORPORATION                 :

                                    :

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment discrimination case is Defendant Didlake Corporation's ("Didlake") motion for summary judgment under Fed.R.Civ.P. 56(b). (Paper 25). The issues are briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary. For the reasons that follow, Defendant's motion will be granted in part and denied in part.

**I. Background**

The following facts are uncontroverted unless otherwise noted. Plaintiff Ronni Jacob, a resident of Montgomery County, Maryland, filed a complaint against Didlake alleging employment discrimination and hostile work environment on the basis of her disability, in violation of state law. (Paper 2). Plaintiff has myotonic muscular dystrophy ("MMD"), diabetes, and certain cognitive disabilities. (Paper 2, ¶ 5). MMD is a progressive, degenerative neuromuscular disease, where muscle tissue is slowly replaced by fatty tissue, causing every motor action to take longer

and to require more energy to accomplish. (Paper 27, Ex. 1, Jacob Aff. ¶ 4; *id.*, Ex. 2, Chaudhry Letter ¶ 3). As a result of MMD, Plaintiff has difficulty walking, stooping, rising from a seated position, standing, and lifting more than five pounds. (Paper 27, Ex. 1, Jacob Aff. ¶ 4).

Didlake, based in Manassas, Virginia, is engaged in job placement services. (Paper 25, at 4). Approximately 75 percent of Didlake's employees have disabilities. (*Id.*). Betty Williams, a Didlake project manager, interviewed and hired Plaintiff for the receptionist position at the Germantown, Maryland facility of the United States Department of Energy ("DOE"). (Paper 27, Ex. 9, Williams Dep., at 8, 26). Once hired, Plaintiff was supervised on a day-to-day basis by Pam Garrett, a DOE employee. (Paper 27, Ex. 7, Jacob Dep., at 38).

Plaintiff was hired in June 2004 on a three month probationary basis, which she completed successfully on September 1, 2004. (Paper 27, Ex. 7, Jacob Dep., at 42-43, 50). During her initial probationary period, Plaintiff had the assistance of a job coach who worked with her at the DOE facility once or twice a week. (*Id.* at 44). Plaintiff testified that during the first three months of her employment, her job duties were answering the phone, signing in guests and employees, calling the vending machine companies, scheduling conference rooms, and coordinating minor maintenance

2

issues.  (*Id*. at 50-51).   None of these duties required much walking or standing.  (*Id*.).

Toward the end of September, Ms. Garrett assigned to Plaintiff additional duties that required her to walk around the two-story building and clean out office supplies from vacant rooms.  (*Id*. at 52-53).  Plaintiff also had to do "meter reads" which meant that, once a month, she had to go to each of the six photocopiers in the building and record how many copies had been made at each photocopier.  (*Id*. at 59-60).

On December 28, 2004, Didlake sent Plaintiff a memorandum stating that she had been verbally warned about several work related issues, on multiple occasions, by Ms. Williams and Ms. Garrett.  (Paper 27, Ex. 23).  The memorandum listed five work related issues and informed Plaintiff that "[t]hese issues are seriously affecting the probability of continued employment and are in direct violation of Didlake's Policy . . ."  and that she was being placed on another 90 day probation.  (*Id*.).

On January 17, 2005, Plaintiff wrote Ms. Williams "to formally request a reasonable accommodation" for her MMD, suggesting that an electric scooter would help with her mobility and energy conservation.  (Paper 27, Ex. 17).  Ms. Williams approved a day off for Plaintiff to get evaluated for a scooter.  (Paper 27, Ex. 7, Jacob Dep., at 100).  Plaintiff also contacted Douglas Rhodes, her counselor at the Department of Rehabilitation Services for

Maryland, and he arranged an "in-service" training by the Muscular Dystrophy Association to help educate Didlake employees about Plaintiff's disability. (Paper 27, Ex. 7, Jacob Dep., at 163; *id*., Ex. 8, Rhodes Decl. ¶ 14).

Plaintiff was terminated on February 25, 2005, (paper 27, Ex. 24), before she could be evaluated for the electric scooter and before the in-service training took place.  A series of e-mail exchanges reflects that the customer dissatisfaction that had led to the December 28 memo to Plaintiff resulted in her termination. A transmission on December 29 includes a draft letter requesting her termination based on behaviors and traits that were unsatisfactory:

> The facility manager has witnessed Ronni yell at a Federal employee which is very unprofessional.
>
> She does not have the ability to distinguish between common occurrences and when something unusual happens; therefore she doesn't act accordingly or inform others.
>
> Ronni does not work independently, has trouble following direction and often complains that she is physically unable to complete tasks that require walking.
>
> Ronni does not pay close attention to detail, therefore she confuses facts and this makes a small task difficult and time consuming.

The letter concludes:

> Our recommendation is to replace Ronni with someone who will provide friendly service to the customer, someone who has the ability to

> complete tasks as directed and walk as needed
> to complete those tasks.

By February 23, 2005, Craig Frame, the Contracting Officer, sent the message to Donald Bromell, who sent it on to Betty Williams. (Paper 27, Exhibit 25).

On December 30, 2005, Plaintiff filed a five count complaint in the Circuit Court for Montgomery County, alleging violations of the Montgomery County Code ("MCC"), Chapter 27 § 27-1, *et seq.*, as authorized by Md. Code Ann., art. 49B.[1]  Didlake filed a timely notice of removal, pursuant to 28 U.S.C. § 1441, and the matter was removed to this court on February 10, 2006, based on the amount in controversy and diversity of parties.  The following claims remain for disposition: count I, denial of reasonable accommodations for a disability; count II, hostile work environment on the basis of a disability; and count III, disparate terms and conditions of employment on the basis of a disability.

Plaintiff asks for judgment that Didlake violated her rights; immediate reinstatement to the receptionist position; compensatory and punitive damages; back pay; front pay, including salary, benefits and other entitlements; attorneys' fees and costs; pre-judgment interest and post-judgment interest; and an order that Defendant expunge all records referencing Plaintiff's involuntary

---

[1] Defendant asserts, and Plaintiff does not deny, that Plaintiff wishes to dismiss counts IV and V.  (Paper 25, at 2). Thus, the court will incorporate the dismissal of counts IV and V into the Order.

termination.  Defendant moves for summary judgment on counts I, II, and III.

## II.  Standard of Review

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate.  *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of S.C. v. South Carolina*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a

particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment." *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th Cir.), *cert. denied*, 522 U.S. 810 (1997).  There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## III.  Analysis

Article 49B, § 42 of the Maryland Code Annotated, authorizes a civil action for damages or other relief in Montgomery County by "a person who is subjected to an act of discrimination prohibited by the county code. . . ."  Disability discrimination, as alleged here, is prohibited by MCC § 27-19:

> (a) A person must not because of the race, color, religious creed, ancestry, national origin, age, sex, marital status, sexual orientation, or genetic status of any

7

> individual or disability of a qualified
> individual, or because of any reason that
> would not have been asserted but for the race,
> color, . . . disability . . . :
> (1) For an employer:
> (A) fail or refuse . . . to accept the
> services of, discharge any individual, or
> otherwise discriminate against any individual
> with respect to compensation, terms,
> conditions, or privileges of employment;. . .

A "disability" is defined in MCC § 27-6(c) as "a physical or mental impairment that substantially limits one or more of an individual's major life activities. . . ."

## A.   Denial of Reasonable Accommodation (count I)

"Although the Montgomery County Code does not expressly say so, it clearly implies that the denial of a reasonable accommodation to an otherwise qualified employee would constitute disability discrimination." *Cohen v. Montgomery County Dept. of Health & Human Servs.*, 149 Md.App. 578, 590-91 (Md.Ct.Spec.App. 2003). The *Cohen* court based its holding, in part, on the relationship between the MCC and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, upon which the MCC is modeled.[2]

---

[2]   MCC § 27-1 provides: "The prohibitions in this article are substantially similar, but not necessarily identical, to prohibitions in federal and state law. The intent is to assure that a complaint filed under this article may proceed more promptly than possible under either federal or state law. It is not County policy, however, to create a duplicative or cumulative process to those existing under similar or identical state or federal laws."

The ADA expressly states that the failure of an employer to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee" is a form of disability discrimination. 42 U.S.C. § 12112(b)(5)(A).  Maryland courts look to federal decisions interpreting the ADA when called upon to interpret the MCC and this court will do the same.  *See Ridgely v. Montgomery County*, 164 Md.App. 214 (Md.Ct.Spec.App. 2005); *Cohen*, 149 Md.App. at 591.

In a *prima facie* failure to accommodate case, a plaintiff must establish that (1) she was an individual who had a disability within the meaning of the statute; (2) the employer had notice of her disability; (3) with reasonable accommodation she could perform the essential functions of the position; and (4) the employer refused to make such accommodations. *Rhoads v. Fed. Deposit Ins. Co.*, 257 F.3d 373, 387 n. 11 (4th Cir. 2001).

The parties disagree on whether the physical tasks Plaintiff was required to perform, namely cleaning out rooms, were "essential functions" of her position as receptionist.  As will be seen, the facts on this issue are in conflict, but Defendant is still entitled to summary judgment because, even if the tasks are regarded as essential, Didlake provided reasonable accommodation.

Neither the MCC nor the ADA defines the term "essential function."  In cases where neither the MCC nor the ADA have defined

a term used in the MCC, at least one Maryland court has looked to the Equal Employment Opportunity Commission ("EEOC") regulations to interpret that term.  *See Ridgely*, 164 Md.App. at 195 (citing EEOC regulations when interpreting term "substantially limits" for discrimination claim brought under MCC).   The EEOC offers some guidance in defining the term "essential functions," it means "the fundamental job duties of the employment position the individual with a disability holds or desires.  The term 'essential functions' does not include the marginal functions of the position."   29 C.F.R. § 1630.2.

The EEOC offers a non-exhaustive list of reasons a job function may be considered essential: (i) because the reason the position exists is to perform that function; (ii) the limited number of employees available among whom the performance of that job function can be distributed; and/or (iii) the function may be highly specialized so that the person is hired for his or her expertise or ability to perform the particular function.  *Id.*

The first and third items from this list weigh strongly in favor of determining that the tasks associated with the move were non-essential functions of the receptionist position at DOE, and the second weighs slightly in favor of determining that they were essential functions.   It cannot be said that the reason the receptionist position existed was to clean out rooms in preparation for a move to another building.   Nor is the function of cleaning

out rooms so highly specialized that the receptionist is hired for her expertise in performing that particular function.  On the other hand, there were only two Didlake employees at the DOE building, which was a limited number among whom the task of cleaning out rooms could be distributed.

Evidence of whether a particular function is essential includes, but is not limited to: (i) the employer's judgment as to which functions are essential; (ii) written job descriptions prepared before advertising or interviewing applicants for the job; (iii) the amount of time spent on the job performing the function; (iv) the consequences of not requiring the incumbent to perform the function; (v) the terms of a collective bargaining agreement;  (vi) the work experience of past incumbents in the job; and/or (vii) the current work experience of incumbents in similar jobs.  29 C.F.R. § 1630.2.

Despite Didlake's argument to the contrary, there is evidence that Plaintiff's Didlake supervisor, Ms. Williams, did not view the moving duties as essential functions of the receptionist position. Ms. Williams testified in her deposition that the "primary function [of the receptionist] was to monitor the front desk and that there were, that was the primary function but that wasn't a full eight hour day.  And that's why the other tasks had always been assigned to that position."  (Paper 27, Ex. 9, Williams Dep., at 91-92). When asked "was the moving associated with Ronni Jacob's job as

receptionist at DOE a marginal or secondary job function," Ms. Williams responded, "I would say a marginal." (*Id*. at 96). However, when later asked to clarify that answer, Ms. Williams stated that the moving duties were going on before Plaintiff got the position, were going on during the entire time that Plaintiff was in the position, occurred almost on a daily basis, were required by Ms. Garrett, were considered an important part of her position, but that they did not take up a large percentage of Plaintiff's daily activities. (*Id*. at 99-100).

The written job descriptions also contain evidence that assisting in physical moves was not an essential function of the job. It is unclear which job description Plaintiff received on her first day of work, (*see* paper 27, Ex. 18, Kennedy Dep., at 12-13; *id*., Ex. 7, Jacob Dep., at 32), but Plaintiff has submitted as evidence a job description for her position, dated May 2003, and Defendant has not offered evidence that this job description is inaccurate. (*See* Paper 27, Ex. 12). The attached job description enumerated ten "essential duties/responsibilities," all of which may be performed while sitting at the reception desk. (Paper 27, Ex. 12). Notably, cleaning out rooms was not listed in the essential duties. Under "non-essential duties/responsibilities," the job description stated that the "[p]rimary function of this position is to monitor the front desk[,]" and listed controlling access to the supply room and maintaining bulletin boards as

additional, non-essential duties. (*Id.*). The job description also described the physical requirements for the position as "sedentary." (*Id.*).

The third type of evidence the court may consider is the amount of time spent on performing certain functions. This factor suggests that the moving duties may have been essential functions of the receptionist position because Plaintiff spent a large portion of her time completing those tasks. Plaintiff testified that on Tuesday and Friday mornings she sat at the receptionist desk, but spent 75% of the rest of the time, *i.e.*, Monday, Wednesday, Thursday and the afternoons of Tuesday and Friday, cleaning out rooms. (Paper 27, Ex. 7, Jacob Dep., at 57-58).

The consequences of not assigning Plaintiff to clean out the rooms, the fourth factor, is that those duties would have to be re-assigned to another employee. There is no relevant collective bargaining agreement, so the fifth factor is not applicable here. Finally, the sixth and seventh factors weigh in favor of determining that the physical elements of the job were essential functions because Ms. Williams testified that the moving duties had historically been assigned to the receptionist position, (paper 27, Ex. 9, Williams Dep., 92), and that the person who replaced Plaintiff continued to perform those functions (*id.* at 62).

Based on this record, it cannot be determined, as a matter of law, that the physical duties either were or were not essential

functions of the receptionist position.  This factual dispute does not preclude summary judgment.  If the duties were not essential, then Didlake was under no duty to provide reasonable accommodation, *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 577 (7th Cir. 2001) ("nothing in the statute requires an employer to accommodate the employee so that she may perform any nonessential function that she chooses.").[3]  If the duties were essential, however, Didlake had a duty to provide reasonable accommodation, but the evidence is uncontroverted that it did so.

The "'reasonable accommodation' question asks whether the accommodation: (1) would be 'effective,' *i.e.*, would it address the job-related difficulties presented by the employee's disability, 29 C.F.R. § 1630.2(o)(1)(i)-(ii); and (2) would allow the employee to attain an 'equal' level of achievement, opportunity and participation, that a non-disabled individual in the same position would be able to achieve, *id.* § 1630.2(o)(1)(iii)."  *Bryant v. Better Bus. Bureau of Greater Md., Inc.*, 923 F.Supp. 720, 736 (D.Md. 1996).

---

[3] As will be discussed with regard to count III, an employer may not terminate an employee due to an inability to perform only marginal duties.  *See, e.g., Metz v. Shell Oil Co.*, 2006 WL 932350 (N.D. Ill. Apr. 6, 2006) (employer cannot argue that it terminated employee for failing to complete tasks considered non essential); *Chiari v. City of League City*, 920 F.2d 311 (5th Cir. 1991) (regulations concerning Rehabilitation Act prohibit city from firing employee because he could not perform tasks that bore only a marginal relationship to the job).

The EEOC regulations provide that "[i]n general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." 29 C.F.R. § 1630.9, at 414 (Appendix: Interpretative Guidance). Once a need is established, "it may be necessary for the [employer] to initiate an informal, interactive process" with the disabled individual in order to "identify the precise limitations resulting from the disability and potential accommodations that could overcome those limitations." *Id.* § 1630.2(o)(3). "[T]he employer must make a reasonable effort to determine the appropriate accommodation." *Id.* § 1630.9, at 414 (Appendix: Interpretative Guidance).

At the time of her interview, Plaintiff said she did not need accommodations. (Paper 27, Ex. 9, Williams Dep., at 64). Plaintiff recalled requesting accommodations several times later during the course of her employment, (paper 27, Ex. 7, Jacob Dep., at 160-162), and the evidence suggests that Didlake made reasonable accommodations upon each request.

Plaintiff chiefly contends that Didlake failed to engage in an interactive process with her and, had she been provided with an electric scooter, she would have been able to perform all her duties adequately.

It is unclear exactly when Plaintiff first requested an electric scooter. It is undisputed that Plaintiff formally requested a scooter on January 17, 2005. (Paper 27, Ex. 17).

15

Plaintiff testified that she "verbally mentioned" a scooter to Ms. Williams in November 2004. (Paper 27, Ex. 7, Jacob Dep., at 98). Mr. Rhodes testified that when Plaintiff's case was re-opened in December 2004, he "suggested" to Ms. Williams that Plaintiff needed a scooter, (paper 27, Ex. 8, Rhodes Decl. ¶ 10); Plaintiff's case was re-opened December 28, 2004, when she was placed back on probation, (*id.*, Ex. 24). Ms. Williams testified that she never received a request for a scooter prior to January 2005. (Paper 27, Ex. 9, Williams Dep., at 100). Plaintiff testified that once she formally requested a scooter, she was promptly given a day off to attend a scooter evaluation, (paper 27, Ex. 7, Jacob Dep. at 97), but Plaintiff's employment was terminated before she could attend the scooter evaluation.

In order for Plaintiff to succeed on her failure to accommodate claim, she must not only allege that Didlake failed to engage in the interactive process to find reasonable accommodation, but that its failure to engage "resulted in the failure to identify an appropriate accommodation for [Plaintiff]." *Scott v. Montgomery County Gov't*, 164 F.Supp.2d 502, 508 (D.Md. 2001) (quoting *Walter v. United Airlines*, 2000 WL 1587489, at *4 (4th Cir. Oct. 25, 2000)). "[T]he ADA does not require an employer to provide the specific accommodation requested . . ., or even to provide the best accommodation, so long as the accommodation . . . is reasonable." *Scott,* 164 F.Supp.2d at 509. Thus, although Plaintiff was never

16

given a scooter, Didlake satisfied its obligation reasonably to accommodate her through other means.

When Plaintiff indicated that she had difficulty maneuvering the carts, a specific cart that she preferred was tagged for her use. (Paper 27, Ex. 9, Williams Dep., at 28). When Plaintiff told Didlake that she was unable to unplug the telephones, it arranged for another employee to perform that task. (*Id*. at 43). When Plaintiff complained that cleaning out the rooms was too tiring, Defendant divided her responsibilities so that she would only do one portion of the building at a time, to minimize walking. (*Id*. at 81). Defendant informed Plaintiff that she could, and should, request help from the other Didlake employee at the DOE building. (*Id*. at 80-81). Defendant also, on its own initiative, provided a job coach to Plaintiff when she was placed on probation. (Paper 27, Ex. 7, Jacob Dep., at 112). No deadlines or time restrictions were set for her to perform the cleaning duties, to allow her to move at her own pace. (*Id*. at 57, 65, 69, 84, 86). These accommodations, taken as a whole, discharge Didlake's obligation under the MCC to provide reasonable accommodations.[4] The accommodations provided by Didlake were reasonable and, therefore, meet the good faith standard of the claim of reasonable

---

[4] Plaintiff reports that when she told her DOE supervisor that cleaning out the rooms was very tiring, and requested limiting the number of rooms she had to clean each day, that request was refused. (Paper 27, Ex. 7, Jacob Dep., at 62). However, there is no evidence that Plaintiff informed Didlake about this incident.

accommodation.   Therefore the "alleged failure to engage in an interactive process is of no consequence." *Scott,* 164 F.Supp.2d at 509.   Didlake made reasonable accommodations for Plaintiff throughout her employment and is entitled to judgment on count I.

**B.  Hostile Work Environment (count II)**

Plaintiff alleges she was subjected to ridicule and demeaning behavior in the workplace as a result of her disability.  (Paper 27, at 21).  Plaintiff argues that this behavior is demonstrated by the unreasonable demands placed on Plaintiff by her DOE supervisor, Ms. Garrett, as well as the constant criticism and ridicule she faced as a result of not being able to meet those unreasonable demands.  (*Id.*).

An ADA plaintiff must prove the following to establish a hostile work environment claim: (1) she is a qualified individual with a disability; (2) she was subjected to unwelcome harassment; (3) the harassment was based on her disability; (4) the harassment was sufficiently severe or pervasive to alter a term, condition, or privilege of employment; and (5) some factual basis exists to impute liability for the harassment to the employer.  *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 177 (4th Cir. 2001).  Defendant alleges that Plaintiff has failed to satisfy the fourth and fifth elements of this test.

As to the fourth element, to recover on a hostile environment claim, a plaintiff must demonstrate not only that she subjectively

perceived her workplace environment as hostile, but also that a reasonable person would so perceive it, *i.e.*, that it was objectively hostile. *Fox*, 247 F.3d at 178. Factors to be considered with respect to the objective component include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). *See also Hopkins v. Balt. Gas & Elec. Co.*, 77 F.3d 745, 753 (4th Cir. 1996) (working environment must be "hostile or deeply repugnant," not "merely unpleasant," to be actionable).

Plaintiff testified that her DOE supervisor, Ms. Garrett, made comments like "why can't you walk faster," and "hurry up," and "why are you so tired" on many occasions. (Paper 27, Ex. 1, Jacob Aff. ¶ 12). Plaintiff stated that Ms. Garrett and Ms. Williams, her Didlake supervisor, would get frustrated with her because she was unable to complete assigned tasks due to her difficulty moving, or was required to take breaks to manage her diabetes, and that this was humiliating to her. (*Id*. ¶¶ 9, 12). Furthermore, Plaintiff submits that she was subjected to injury and risk of injury by being required to do tasks beyond her physical capability, as evidenced by the incident in which she tripped on the wheels of a

chair Ms. Garrett required her to move.  (Paper 27, Ex. 7, Jacob Dep., at 69).

On summary judgment, any permissible inferences to be drawn from underlying facts must be viewed in the light most favorable to the party opposing the motion, *i.e.*, Plaintiff.  *Teamsters Joint Council No. 83 v. Centra, Inc*., 947 F.2d 115, 119 (4th Cir. 1991). Based on the facts alleged by Plaintiff, a reasonable fact finder could determine that Plaintiff suffered harassment that was sufficiently severe or pervasive to alter the conditions of her employment.  *See also Amirmokri v. Balt. Gas & Elec. Co.,* 60 F.3d 1126, 1130-31 (4th Cir. 1995) (holding that whether harassment is sufficiently severe or pervasive to create a hostile work environment is quintessentially a question of fact).

Plaintiff, however, still must establish the fifth element, that is, she must allege facts sufficient to impute liability for the harassment to Didlake.  Plaintiff's daily supervisor was Ms. Garrett, a DOE employee.  There is no evidence that Didlake either participated in the alleged harassment or was aware that it occurred.  Although Plaintiff stated in her affidavit that she "repeatedly told Betty Williams [her Didlake supervisor] that [she] was having difficulty doing these tasks" and that she was on "the receiving end of what was clearly frustration that [she] could not do something by . . . Betty Williams[,]" (paper 27, Ex. 1, Jacob Aff., ¶ 9) that testimony is contradicted by her deposition

testimony.   In her deposition, Plaintiff repeatedly stated she could not recall informing Ms. Williams, or other Didlake managers, of any harassment or unreasonable demands.   Furthermore, she presents no specific evidence of Ms. Williams expressing "frustration" or behaving in a harassing manner.

Plaintiff discussed two instances in which she needed to take breaks from her tasks to eat to maintain her blood sugar and to rest her legs,

> Q:  What was [Ms. Garrett's] reaction?
> A:  She got upset about it . . .
> Q:  Did you bring either of these incidents to the attention of Didlake?
> A:  I don't recall.

(Paper 27, Ex. 7, Jacob Dep., at 79).   While discussing her trouble completing the assignment to clean out vacant rooms in the building due to her difficulty moving, Plaintiff again stated that she could not recall informing Didlake of her problem:

> Q: And did Betty [Williams] know that you needed more time to get some of these tasks done as well?
> A: I don't know.
> Q: Did you tell Betty that you were having a hard time getting tasks done?
> A: I told her that I was working on it the best I could.

(*Id*. at 160).  Plaintiff also described an incident where her co-worker yelled at her after she requested help from him in completing a physical task, but she stated that she never told Ms. Williams about the incident.  (*Id*. at 87).  Although the co-worker who yelled at her was also a Didlake employee, that incident alone

21

is not sufficient to impute liability to Didlake.  *See Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998) (isolated or genuinely trivial acts constituting ordinary adversities in workplace not actionable).

Plaintiff's conflicting accounts of whether she informed Defendant of the harassment at work or the unreasonable demands placed upon her is insufficient to create a triable issue of fact. Plaintiff's affidavit, sworn to on September 11, 2006, contradicts her prior testimony, taken by deposition on July 19, 2006.  As the United States Court of Appeals for the Fourth Circuit has stated:

> "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Perma Research and Dev. Co. v. Singer*, 410 F.2d 572, 578 (2nd Cir. 1969).  A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct. *Radobenko v. Automated Equip. Co.*, 520 F.2d 540, 544 (9th Cir. 1975).

*Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984).  There are insufficient facts to impute liability to Didlake for the actions of Ms. Garrett, a DOE employee.  Additionally, the only specific instance of potentially harassing behavior by a Didlake employee does not rise to the level of "severe and pervasive." Defendant is entitled to judgment on count II, the hostile work environment claim.

**C. Disparate Terms and Conditions of Employment (count III)**

Plaintiff claims she was subjected to disparate terms and conditions of employment because she was terminated on the basis of her disability, in violation of the MCC.  (Paper 2, at 19).  The reasons for her termination are essentially contained in the e-mail message initially sent by DOE at the end of December.  (Paper 27, Exhibit 25).  While most of the articulated complaints were not disability related, the list included a complaint about Plaintiff not being able to complete tasks requiring walking and, ultimately, DOE requested a replacement who could "walk as needed to complete those tasks."  (*Id.*)

In a wrongful discharge case, a plaintiff makes out a *prima facie* case by demonstrating that (1) she is within the statute's protected class; (2) she was discharged; (3) at the time of her discharge, she was performing the job at a level that met her employer's legitimate expectations; and (4) her discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination.[5]  *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001).  In clarifying the fourth prong, the Fourth Circuit stated, "it is necessary . . . to require that the plaintiff present some other affirmative evidence that disability

---

[5]  In its motion for summary judgment, Didlake erroneously set forth the standard for a *prima facie* case of disparate discipline, as opposed to wrongful discharge.  (Paper 25, at 16).  In count III, Plaintiff challenges her termination, not any disciplinary actions taken prior to that.  (Paper 2, at 19).

was a determining factor in the employer's decision." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 59 (4th Cir. 1995). "This formulation should not be interpreted as diminishing the plaintiff's burden in proving her *prima facie* case. While the burden is 'not onerous,'. . ., it is also not empty or perfunctory." *Id.* (citing *Tx. Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). Plaintiff's evidence must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law. *Id.*

It is undisputed that Plaintiff is disabled within the meaning of the MCC and she was discharged. The other aspects of a *prima facie* case, however, are problematic. The third prong of a *prima facie* case, that she was performing the job at a level that met her employer's legitimate expectations, is in dispute, primarily because the parties disagree as to whether some of the physical duties were essential or only marginal duties.

It is again necessary to evaluate whether certain duties were "essential" to the position. If, as Defendant claims, the physical duties were essential, and Plaintiff was unable to perform them even with reasonable accommodation, then Defendant is entitled to summary judgment because Plaintiff cannot prove that she was meeting her employer's "legitimate expectations." On the other hand, if, as Plaintiff claims, certain of the physical duties were

24

not essential, then Defendant was not permitted to consider her
inability to perform them in assessing whether she was qualified to
continue in the position.  In that case, the evidence suggests that
Defendant might, at least in part, have used Plaintiff's disability
as a determining factor.   The current formulation in the Fourth
Circuit is as follows:

> As we explained in *Hill* [*v. Lockheed Martin
> Logistics Management, Inc.*, 354 F.3d 277, (4th
> Cir. 2004)], a Title VII plaintiff may "avert
> summary judgment . . . through two avenues of
> proof."  354 F.3d at 284 [].  A plaintiff can
> survive a motion for summary judgment by
> presenting direct or circumstantial evidence
> that raises a genuine issue of material fact
> as to whether an impermissible factor such as
> race motivated the employer's adverse
> employment decision.  *Id.*  Pursuant to the
> 1991 Act, the impermissible factor need not
> have been the sole factor.  As long as it
> motivated the adverse action, the plaintiff
> can establish an unlawful employment practice.
> *See* 42 U.S.C.A. § 2000e-2(m).  Alternatively,
> a plaintiff may "proceed under [the *McDonnell
> Douglas*] 'pretext' framework, under which the
> employee, after establishing a *prima facie*
> case of discrimination, demonstrates that the
> employer's proffered permissible reason for
> taking an adverse employment action is
> actually a pretext for discrimination." *Hill*,
> 354 F.3d at 285.

*Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318 (4th
Cir. 2005).  In *Hill*, the court explained the historical evolution
of the mixed-motive case:

> a plaintiff may establish a claim of
> discrimination by demonstrating through direct
> or circumstantial evidence that sex or age
> discrimination motivated the employer's
> adverse employment decision.  The employee,

however, need not demonstrate that the
prohibited characteristic was the sole
motivating factor to prevail, so long as it
was a motivating factor.  In such cases,
historically referred to as "mixed-motive"
cases, it is sufficient for the individual to
demonstrate that the employer was motivated to
take the adverse employment action by both
permissible and forbidden reasons.  *See* 42
U.S.C.A. § 2000e-2(m); *Price Waterhouse v.
Hopkins*, 490 U.S. 228, 241, 109 S.Ct. 1775,
104 L.Ed.2d 268 (1989).

Prior to enactment of the Civil Rights Act of
1991, the Supreme Court had recognized that
adverse employment decisions could be
motivated by both legitimate and
discriminatory reasons. *See Price Waterhouse*,
490 U.S. at 241, 109 S.Ct. 1775.  To proceed
under this mixed-motive theory, however, the
plaintiff was required to offer direct
evidence of discrimination.  If the plaintiff
was successful, the burden then shifted to the
employer, who could escape liability by
proving that it would have made the same
decision in the absence of the discriminatory
motivation. *See id.* at 276, 109 S.Ct. 1775
(O'Connor, J., concurring).

In response to *Price Waterhouse*, Congress
added § 2000e-2(m) to Title VII in the Civil
Rights Act of 1991, providing that "an
unlawful employment practice is established
when the complaining party demonstrates that
race, color, religion, sex, or national origin
was a *motivating factor* for any employment
action." 42 U.S.C.A. § 2000e-2(m) (emphasis
added).  The effect of the amendment was to
eliminate the employer's ability to escape
liability in Title VII mixed-motive cases by
proving that it would have made the same
decision in the absence of the discriminatory
motivation.  Rather, through such proof, the
employer can now only limit the remedies
available to the employee for the violation.
*See* 42 U.S.C.A. § 2000e-5(g)(2)(B).  "On a
claim in which an individual proves a
violation under section 2000e-2(m)" and the

employer "demonstrates that [it] would have taken the same action in the absence of the impermissible motivating factor, the court . . . may grant declaratory relief, injunctive relief, and attorney's fees and costs demonstrated to be directly attributable only to the pursuit of a claim under section 2000e-2(m)," but "shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment." *Id.*

Since enactment of section 2000e-2(m), our cases have nonetheless adhered to *Price Waterhouse*'s requirement that a Title VII plaintiff present direct evidence to establish a mixed-motive discrimination case. *See Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999) (*en banc*) (noting that a "plaintiff qualifies for the more advantageous standard of liability applicable in mixed-motive cases if the plaintiff presents direct evidence that decisionmakers placed substantial negative reliance on an illegitimate criterion" in reaching their decision (internal quotation marks omitted)); *Brinkley v. Harbour Recreation Club*, 180 F.3d 598, 606-07 (4th Cir. 1999) (same). Such proof, we held, commanded the production of "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Fuller v. Phipps*, 67 F.3d 1137, 1142 (4th Cir. 1995).

Recently, however, the Supreme Court considered whether direct evidence is required for a plaintiff to obtain a mixed-motive instruction under § 2000e-2(m); the Court held that no such "heightened showing through direct evidence" is required. *Desert Palace Inc. v. Costa*, 539 U.S. 90, ----, 123 S.Ct. 2148, 2153, 156 L.Ed.2d 84 (2003). Relying upon the plain text of the statute, the Court held that a Title VII plaintiff "need only demonstrat[e] that an employer used a forbidden consideration with respect to any employment practice." *Id.* "In order to

27

> obtain an instruction under § 2000e-2(m), a
> plaintiff need only present sufficient
> evidence," direct or circumstantial, "for a
> reasonable jury to conclude, by a
> preponderance of the evidence, that race,
> color, religion, sex, or national origin was a
> motivating factor for any employment
> practice." *Id.* at 2155 (internal quotation
> marks omitted).

*Hill*, 354 F.3d at 284-85.

The evidence in this case reveals that Plaintiff was not meeting what were undeniably considered to be some of Didlake's legitimate expectations. There is some evidence, however, that Plaintiff's inability to meet additional physical expectations was also considered.

Ms. Williams testified that the primary reason for Plaintiff's termination was " . . . job performance. . . . Not staying on task, the getting loud with people, always needing someone to do her job." (Paper 27, Ex. 9, Williams Dep., at 98).  Internal emails indicate that Plaintiff's DOE supervisor was dissatisfied with Plaintiff's job performance and communicated that to Plaintiff's Didlake supervisor, Ms. Williams. (*See* Paper 27, Ex. 20, Email from B. Williams, 12/09/04; *id.*, Ex. 21, Email from B. Williams, 12/16/04).  Plaintiff's DOE supervisor complained about several aspects of Plaintiff's job performance: that Plaintiff depended on others to perform her duties, she spoke rudely to people, she wrote down the wrong DOE tag numbers, she did not pay attention to detail, she did not follow directions, she inappropriately asked

the security staff for personal favors, she did not know her way around the building after five months, she did not stay on task during assignments, and she told her supervisor more than once that "it's not a good day" and she would not be doing much work. (*Id.*). Plaintiff received verbal warnings over several months prior to her termination. (Paper 27, Ex. 16, at 1).

On December 28, 2004, Didlake wrote a memorandum to Plaintiff, informing her that she was being placed on a 90 day probationary period. (Paper 27, Ex. 23). The memorandum identified five areas of concern: "1. Asking federal employees to tie your shoes, open your drink containers and other personal favors[;] 2. Customer service skills, speaking to individuals in a very loud rude tone[;] 3. Not following through with instructions[;] 4. Not paying attention to detail, often writing down incorrect information[; and] 5. Overall disinterest in performing the job hired for[.]" (*Id.*).

Plaintiff responded by memorandum dated January 5, 2005, in which she acknowledged the problems and attributed several of them to the stress and fatigue resulting from being asked to do physical tasks of which she was incapable. (Paper 27, Ex. 16). Plaintiff's employment was terminated on February 25, 2005, prior to the end of her probationary period, because "there has been little or no improvement in areas of deficiency." (Paper 27, Ex. 24). Plaintiff also identified a letter written by DOE employees at the

start of her probationary period that recommends that Plaintiff be replaced "with someone who will provide friendly service to the customer, someone who has the ability to complete tasks as directed and *walk as needed to complete those tasks*." (Paper 27, Ex. 25 (emphasis added)).

Thus, if Defendant properly considered the ability to perform all of the physical tasks assigned to Plaintiff as part of its legitimate expectations, Plaintiff cannot make out a *prima facie* case of disability discrimination and Defendant would be entitled to judgment as a matter of law.   On the other hand, if some of those physical tasks were only marginal duties, then consideration of her inability to perform them would be illegitimate, and Plaintiff will have established a *prima facie* case of disability discrimination, at least on a mixed-motive rationale.   Thus, the court will deny summary judgment on count III.

## IV.  Conclusion

Plaintiff has failed to establish *prima facie* cases of denial of reasonable accommodation or hostile work environment. Accordingly, Defendant's motion for summary judgment will be granted with respect to counts I and II.   The motion will be denied as to count III.   Counts IV and V will be dismissed. A separate Order will follow.

_____/s/_____

DEBORAH K. CHASANOW
United States District Judge

30